### In re R. L. WITTERS ASSOCIATES, Inc.

No. 1631-M.

District Court, S. D. Florida, Miami Division.

June 16, 1937.

Leland Hyzer, of Miami, Fla., for debtor.

Herbert U. Feibelman and Stapp, Gourley, Ward & Ward, all of Miami, Fla., for creditors.

HOLLAND, District Judge.

R. L. Witters Associates, Inc., a Florida corporation, filed its certificate of incorporation on July 24, 1935. It began its operations in this county and dealt in building materials and sold merchandise, consigned and otherwise. R. L. Witters, chairman of the board, testified: "We have a warehouse in which we store materials for various concerns, which materials we sell on commission, and for which we are paid a storage charge as well as a commission on the sales." "We buy some materials merely as a storage warehouse, with which we have nothing to do except to keep the materials intact for the call of the own-

er." "Some of the materials which come into our warehouse we re-sell and pay for ourselves and some of them we bill on the manufacturers' invoices for them. Some of them we merely deliver tickets to the manufacturer to show that certain materials of his have been sold and delivered and he does his own billing."

In January, 1936, the debtor acquired three lots in Miami Beach, Fla., more particularly described as: "Lots Twenty-five (25), Twenty-six (26) and Twenty-seven (27) of Block One Hundred Eleven (111) of Ocean Beach Addition No. 3, in the City of Miami Beach, Florida," at a cost of $25,-000. Thereafter, it improved this property with a warehouse and dock. The original cost of this warehouse was between $23,000 and $24,000, making a total cost of this property of approximately $48,000 or $49,000. The property was encumbered, and at the time of the hearing there were outstanding against the property a first mortgage of $18,000, a second mortgage of $6,300, "and a fraction," a third mortgage of $960, and a fourth mortgage, upon which there is a balance of $3,110. It further appears from the testimony that the second, third, and fourth mortgages have been acquired by, or given, the Coconut Grove Exchange Bank, and that the mortgages held by this bank have matured and no definite arrangements have been made for their maturity in the future.

The warehouse property was used and occupied by this debtor, R. L. Witters Associates, Inc., from the time that it was completed, in 1936, until December 18 of that year, when the debtor entered into "articles of agreement" with Cement Sales, Inc., a Florida corporation, of which R. L. Witters, the chairman of the board of R. L. Witters Associates, Inc., is the president. While the debtor continued its office in this warehouse building, the possession was legally turned over to Cement Sales, Inc.

Under the terms of these "articles of agreement," R. L. Witters Associates, Inc., covenanted and agreed "to convey and assure" to Cement Sales, Inc., this valuable and principal asset of the debtor corporation for the following consideration: $200 in cash at the time of the execution of the agreement, the assumption of mortgages then existing in the sum of $29,500, and the payment of $21,500 in monthly installments of $200 each. The "articles of agreement" further provided: "Said monthly installments shall be applied first to the payment of interest and the balance to principal, interest being at the rate of five percent. (5%) per annum on said sum of Twenty-one Thousand Five Hundred Dollars ($21,500.00);"

The purchaser further agreed "to pay all taxes, assessments or impositions that may be legally levied or imposed upon said land subsequent to the year 1936, and to keep the buildings upon said premises insured in some company satisfactory to the party of the first part in a sum not less than six thousand dollars .($6,000.00) during the term of this agreement."

The contract on behalf of R. L. Witters Associates, Inc., was signed by Gordon Witters, president.

By actual computation, it appears that the equity above the mortgages, $21,500, would thus be paid by the purchaser in nearly twelve years.

The testimony of Rupert L. Rackley, chairman of the Appraisal Board of the Miami Realty Board, showed that the market value of this warehouse property at the present time was $56,500, and the improvements alone, for which only $6,000 in insurance was provided by the "articles of agreement," were worth $30,000.

The debtor, through R. L. Witters, chairman of the board of R. L. Witters Associates, Inc., debtor, and himself the president of Cement Sales, Inc., and apparently the directing head of both corporations, undertook to explain that the debtor had not previously gone into the cement business, but there was a decision, apparently by Mr. Witters, to go into the business of importing foreign cement, and for this purpose Cement Sales, Inc., was organized. It was necessary, however, for this corporation to have credit. The capital with which it was organized was only $3,000. It was evident that the company needed financial strength for the business of importing foreign cement, and in order that letter of credit might be obtained, the most valuable asset of the debtor corporation, its warehouse building, the very building in which it did its principal business, was conveyed to this new Witters corporation, and the only consideration passing at the time was $200, unless the obligation of paying $21,500 over a period of nearly twelve years, and the assumption of all taxes and assessments, and the requirement of taking out insurance to the

650

amount of one-fifth of the value of the improvements, by a corporation with a capital only of $3,000, can be considered additional consideration. At all events, the possession of the building passed to the new Witters corporation without adequate provision being made for the payment of the indebtedness of numerous creditors of R. L. Witters Associates, Inc., whose indebtedness, by the very statement of assets and liabilities filed in this court on May 29, 1937, amounted to $26,362.67, and apparently all of this indebtedness was past due.

Thereafter, on February 23, 1937, R. L. Witters Associates, Inc., together with Cement Sales, Inc., executed a mortgage in favor of the Coconut Grove Exchange Bank, upon the warehouse property. This mortgage secures two antecedent debts of R. L. Witters Associates, Inc., one a note dated October 20, 1936, for $4,000, and one a note dated January 22, 1937, for $1,500, yet it is apparent that this mortgage secures an indeterminate indebtedness, including debts of another Witters corporation, whose place of business appears to be the residence of R. L. Witters himself, the corporation known as Lumber Sales, Inc. This mortgage provides: "Provided, always, that if the said Mortgagors, their successors or assigns, shall pay or cause to be paid unto the said Mortgagee, its successors or assigns, the balance due on said promissory note executed by R. L. Witters Associates, Inc., dated October 20, 1936, in the original amount of $4,000.00, the indebtedness represented by the promissory note executed by R. L. Witters Associates, Inc., dated January 22, 1937, in the amount of $1,500,00, in accordance with the terms and provisions of said promissory note, and shall pay or cause to be paid unto the said Mortgagee, its successors and assigns, each and every the various trade acceptances held by said Mortgagee, endorsed by Lumber Sales, Inc., and shall well and truly pay unto the said Mortgagee, its successors and assigns any future loans, discounts, credits or advances made by the said Mortgagee, to R. L. Witters Associates, Inc., Cement Sales, Inc., and Lumber Sales, Inc., or any of them, represented by promissory notes, trade acceptances, or letters of credit, and shall perform, comply with and abide by each and every the stipulations, agreements, conditions and covenants of said promissory notes, trade acceptances, or letters of credit, and of this deed, then

this deed and the estate thereby created, shall cease and be null and void."

These facts reflect the disposition of the real estate, the warehouse property, and the debtor's right to possession and use of it. As to the personal property owned by this debtor, its merchandise, accounts receivable, and other items, a comparison of the financial statement emitted by its president, Gordon Witters, October 15, 1936, a copy of which was attached to the petition of the Atlantic Gypsum Products Company, and which was not controverted in the testimony, and the statement filed in this court as of May 10, 1937, reveals a striking disparity and a substantial reduction in these assets. For instance, the accounts receivable were reduced from $18,265.80 to $9,844.97, and merchandise inventory from $14,004.04 to $1,489.92. There were other marked differences. These show that the business of the debtor had been considerably liquidated at the time of the filing of the petition for reorganization on May 10, 1937.

The court, therefore, finds from all of these facts, that this corporation is no longer an active, going concern. If it possessed any good will, which should be protected by this court through reorganization proceedings, certainly such good will has been lost, for the volume of its business compared to its former operations is insignificant. Certainly the prospects of an expedient and economical reorganization are not apparent. There appears to be no certainty whatever that this corporation can be reorganized. In truth and in fact, it has gone a long way towards liquidation without apparent benefit to the creditors themselves. There is no reasonable expectation of continued useful existence, or successful rehabilitation.

Morevoer, the court finds that the management and the ownership of this corporation have not only disposed of the chief asset for a present consideration that is inadequate and a future consideration that is questionable, but no reasonable provision is made that the assets which now are available, including the "articles of agreement" with Cement Sales, Inc., can, by any process of reorganization, be employed for the discharge of the large amount of matured obligations of this debtor. In addition the corporation through its fourth mortgage in favor of the Coconut Grove Exchange Bank has made it possible for unnamed and unknown creditors of the

corporations, Cement Sales, Inc., and Lumber Sales, Inc., Witters' enterprises, to appropriate the chief asset of this debtor for the satisfaction of their claims, unless the "articles of agreement" with Cement Sales, Inc., and the fourth mortgage in favor of the Coconut Grove Exchange Bank, can be successfully assailed and set aside by the existing creditors of R. L. Witters Associates, Inc.

■ If the financial condition of the debtor unquestionably indicates that the only possible expedient, from a business standpoint, is immediate liquidation, the court should not consider that the petition has been filed in legal good faith and may dismiss the same. In re Grigsby-Grunow Co. (C.C.A.) 77 F.(2d) 200.

The good-faith clause of section 77B of the National Bankruptcy Act, as amended (11 U.S.C.A. § 207), has been employed as a basis for refusing approval to all petitions except those in which the prospects of economically expedient reorganization appear fairly certain at the time of filing. 49 Harvard Law Review, 1128.

■ By reference to "good faith" the meaning is not merely sincerity of intention. The expression embraces a reasonable expectation of continued useful existence. There must be reasonable prospect for successful rehabilitation of the debtor. In re Tennessee Publishing Co. (C.C.A.) 81 F.(2d) 463.

■ Undoubtedly section 77B is aimed at the "continuance of a business as a going concern," and does not contemplate an inactive corporation, bereft of its chief means of livelihood. Brockett v. Winkle Terra Cotta Company (C.C.A.) 81 F.(2d) 949.

■ Where a case presented is one for liquidation or for composition, proceedings under 77B should not be approved and the rights of creditors must be guarded and recognized throughout the proceedings as paramount to those of stockholders. In re Dutch Woodcraft Shops (D.C.) 14 F.Supp. 467.

■ In proceedings of this character, the rights of creditors should be protected. They should be given every opportunity to recover any property which may have been conveyed under circumstances of questionable benefit to the creditors themselves. They should be given opportunity in proper proceedings to undertake to recover this property, upon the faith of which they may have extended credit, if in truth and in fact it has been wrongfully conveyed.

■ There is before me, in making a decision on the pending motions, which were argued before me on June 15, 1937, the question of good faith on the part of the debtor in filing its petition under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). This I think is a question of legal good faith. Involved in its consideration is not only a continued possession or ownership by the debtor of the assets of the debtor, of which it has been possessed during its more recent active months, but also the question of its continued active existence as a going corporation. The factual situation presented by the evidence, which was taken on a motion to dismiss, discloses that the debtor has changed its ownership of this real estate holding from that of fee owner, subject to mortgage, to that of an equitable ownership; the real estate having been conveyed to another corporation which is controlled by the same officers which constitute the managing directorate of the debtor. The evidence discloses a decreased activity by the debtor to the extent that its situation as a going corporation seeking to secure the benefits of section 77B of the Bankruptcy Act have been materially changed. The court in determining the legal good faith of a debtor seeking the benefits of the said section of the Bankruptcy Act should consider whether the debtor presents itself as applicant as a going corporation, continuing, and proposing to continue, its general activities without a radical change in its structural organization.

The real estate involved constitutes a very large portion of the corporate assets. The transfer of the real estate is to another corporation, officered by the same management. Creditors of the debtor corporation have had their rights materially affected by this transfer of real estate. Until the day of that transfer, the creditors had the right to look to the assets of the debtor corporation for whatever they were worth, but this debtor corporation has changed that status. The real estate has been conveyed to another corporation at a fixed value, and the rights of creditors of the debtor corporation have been transformed by that transfer from rights as against the fee owner of real estate to rights against an equitable ownership, with rights having been created in another cor-

poration. This has all been of more or less recent date. This change of ownership of the real estate, together with its conveyance to this other corporation, has also materially changed the prospects of the creditors enjoying fruits from the activities of the debtor corporation. The Cement Sales, Inc., will at least enjoy a part of the business activities of the debtor corporation. The same real estate is used for warehouse and distributing of merchandise purposes. I am of the opinion that the factual situation has been so changed, to the possible and probable disadvantage of creditors of the debtor corporation, that there is not the legal good faith required of the debtor corporation to justify its benefitting by the provisions of the said section of the Bankruptcy Act.

In addition to these reasons, the court is particularly struck with the character of the mortgage which the debtor corporation joined in executing, constituting a fourth mortgage on the real estate involved. This mortgage was executed by the Cement Sales, Inc., and the debtor corporation joined in its execution. Under the terms of that mortgage, loans of money may be made in the future by the mortgagee direct to the mortgagor, Cement Sales, Inc., and these amounts subsequently advanced may become claims of a prior nature to the amounts of money due to the debtor corporation from Cement Sales, Inc., under the contract of sale.

My opinion and decision is that the petition for reorganization filed by the debtor should be dismissed.

An order of dismissal will be entered June 24, 1937.